**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **FIRST HORIZON CORPORATION,** ) | |
| **FIRST HORIZON BANK, and** ) | |
| **FIRST HORIZON ADVISORS, INC.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No.** |
| ) | **JURY DEMANDED** |
| **PINNACLE FINANCIAL** ) | |
| **PARTNERS,** ) | |
| ) | |
| **Defendant.** ) | |

**COMPLAINT FOR DAMAGES**

Plaintiffs First Horizon Corporation ("FHC"), First Horizon Bank (the "Bank"), and First Horizon Advisors, Inc. ("FHA") (collectively "First Horizon" or "Plaintiffs"), by and through counsel, and file this Complaint against Defendant Pinnacle Financial Partners, Inc. ("Pinnacle"), alleging as follows:

**PARTIES**

1.      FHC, formerly known as First Horizon National Corporation, is a Tennessee corporation, first incorporated in 1968, with its principal place of business at 165 Madison Avenue, Memphis, Tennessee 38103.  FHC is a bank holding company and a financial holding company.

2.      The Bank is a Tennessee banking association organized and existing under the laws of the State of Tennessee, also with its principal place of business at 165 Madison Avenue, Memphis, Tennessee, 38103. The Bank is a wholly-owned subsidiary of FHC.

3.      FHA is a Tennessee corporation which is a wholly-owned subsidiary of the Bank, also with its principal place of business at 165 Madison Avenue, Memphis, Tennessee 38103.  First

1

Horizon Advisors is the trade name for the wealth management products and services provided by the Bank and its affiliates.

4.      Pinnacle is a financial services firm headquartered in Nashville, Tennessee. Pinnacle has offices across Tennessee, including five offices in Shelby County.  According to the "Who We Are" section of Pinnacle's website (which is located at https://www.pnfp.com/about-pinnacle/who-we-are/) (last accessed August 19, 2022), Pinnacle is a "values-driven organization" and, "[f]rom our hiring philosophy to our client service, our goal is to demonstrate our values in every interaction."  Pinnacle's core values, according to its website, include "integrity" and "fairness."  (*Id.*)  Pinnacle may be served with process through its registered agent, Robert A. McCabe, Jr., 150 3rd Avenue South, Suite 900, Nashville, Tennessee 37201.

## JURISDICTION AND VENUE

5.      This Court has original subject-matter jurisdiction over this action because First Horizon brings a federal claim pursuant to the federal Defend Trade Secrets Act, 18 U.S.C. § 1836. The Court has subject matter jurisdiction over these claims pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over First Horizon's state law claims under 28 U.S.C. § 1367 because they arise out of the same set of operative facts as the federal claim.

7.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1), (c)(2) because Pinnacle is subject to the Court's personal jurisdiction with respect to this civil action.

## FACTS

**Introduction**

8.    This case involves the latest bad acts by Pinnacle, who has a history of unfairly competing with First Horizon (f/k/a First Tennessee Bank National Association), including a pattern of planned raids to "lift out" entire teams of First Horizon employees, which necessarily requires recruitment and coordination among the employees who leave while still employed by First Horizon, in breach of their fiduciary duty of loyalty to First Horizon.

9.    In 2016, First Horizon sued Pinnacle for civil conspiracy, aiding and abetting breach of fiduciary duty, and unfair competition in connection with the "lift out" of a group of private wealth bankers led by Damon Bell, who at the time of the lift out was a private wealth banker at First Tennessee Bank National Association. As a result of the settlement of that lawsuit, Pinnacle and First Horizon issued a press release as follows: "Pinnacle and First Tennessee are pleased to announce that they have resolved the dispute which led to this lawsuit.  Terry Turner, CEO of Pinnacle, stated, 'I deeply regret that this came about and that anything we did may have caused it.'"

10.    Pinnacle entered the market for financial services in both Memphis and Chattanooga in 2015.

11.    Since that time, Pinnacle has sought to expand its financial services in an attempt to compete with other financial institutions, including First Horizon.

12.    Rather than engage in fair competition, Pinnacle again targeted for a raid at First Horizon two wealth management teams based in Memphis and Chattanooga, to expand their provision of financial services and solicit additional clients.

13.     The first of those teams was based in Chattanooga, Tennessee and led by Christopher Frank ("Frank"), joined by David Buntin ("Buntin"), Kelsey Whitmire Ridge ("Whitmire"), Teya Richardson ("Richardson"), and Trip Butler ("Butler"), all also employees of FHA (altogether referred to herein as the "Frank Group"). A sixth member of the Frank Group was approached by Frank to leave FHA and work for Pinnacle but remains with FHA.

14.     Prior to August 11, 2022, Frank's position with the Bank was Vice President, Investment Officer; his position with FHA was Vice President, Financial Advisor.

15.     As an Officer and employee of the Bank, Frank was eligible to enroll and did enroll in First Horizon's Deferred Compensation Bonus Program and executed a "Financial Advisor Participation Agreement" (the "Frank Participation Agreement") with the Bank, a copy of which is attached hereto as **Exhibit A**.[1]

16.     As an employee of FHA, Frank also executed an Agreement dated December 19, 2000, with FHA (f/k/a "First Tennessee Brokerage, Inc."), which contains provisions prohibiting his solicitation of employees and customers for a period of one (1) year following the termination of his employment. A copy of this Agreement is attached as **Exhibit B**.

17.     The second "team" was based in Memphis, Tennessee and led by Eric Fountain ("Fountain"), joined by Ben Nicol ("Nicol"), Wendy VanCleve ("VanCleve"), Todd Ruston ("Ruston"), Jennifer Brown ("Brown"), Kaleb Simington ("Simington"), Haley Williams, and Paige Williams (altogether referred to herein as the "Fountain Group"). Pinnacle and Fountain also recruited a ninth employee, FHA employee Zach Wiggs ("Wiggs").

---

[1] Plaintiffs have filed redacted copies of Exhibits A and C pursuant to W.D. Tenn. ECF Policies and Procedures § 13.4.3.

18.      Prior to August 12, 2022, Fountain's position with FHA was Vice President, Financial Advisor.

19.      As an Officer and employee of FHA, Fountain was eligible to enroll and did enroll in First Horizon's Deferred Compensation Bonus Program and executed a Participation Agreement with the Bank, similar to that of Fountain, a copy of which is attached hereto as **Exhibit C** (the "Fountain Participation Agreement").

20.      As an employee of FHA, Fountain also executed a Confidentiality and Non-Solicitation Agreement dated December 6, 2010 with FHA (f/k/a "First Tennessee Brokerage, Inc."), which contains provisions prohibiting his solicitation of customers for a period of one (1) year following the termination of his employment.  A copy of this Agreement is attached as **Exhibit D**.

21.      In exchange for incentive awards of restricted stock units ("RSUs") in FHC, Fountain and Frank signed their Participation Agreements, in which they each agreed to certain reasonable restrictions on their employment-related activities for a period extending twelve months past the end of their employment, including the following:

### Non-Disparagement and Non-Interference

You agree that you will not directly or indirectly undertake, implement, participate in, assist in, nor encourage any activity or efforts which damages the business or personal reputations of the Company [defined as the Bank, FHC and any wholly-owned subsidiary of the Bank or FHC] or any of its officers, directors, advisory board members, employees, affiliates, customers, vendors, or business partners, or which create a significant risk of causing such damage.  You further agree that you will not, and will not attempt to, directly or indirectly interfere with any relationship of the Company with any of its officers, directors, advisory board members, employees, customers, vendors, business partners, charities, civic organizations, or the communities in which the Company operates.

### Non-Disclosure

In order to protect the legitimate interests of the Company, you agree that you will not disclose to others at any time in the future, whether directly or indirectly, any

information relating to the Company's business operations, plans, or other confidential business information and/or trade secrets of the Company which you received or to which you were given access during your employment with the Company.  If such information is required to be produced by law, court order, or governmental authority, you must promptly notify the Company of that obligation.

. . .

You agree that you will return to the Company any and all documents belonging to it, as well as any other property which belongs to it, and that no such documents or materials or property will be taken or retained by you after your employment terminates. The term "documents" includes any record on any physical or electronic medium.

With respect to any information concerning one or more specific customers which identifies any such customer or which includes sensitive identity information such as social security numbers, this non-disclosure covenant does not expire.

### *Non-Solicitation*

In order to protect the legitimate interests of the Company, you agree that you will not, either on your own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit, hire, or encourage any person who is then an employee of the Company to leave the employment of the Company.

In order to protect the legitimate interests of the Company, you further agree that you will not, either on your own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit or contact any person or entity who is a Customer of the Company at the time of such solicitation or contact, with the intent or effect of (i) providing one or more services to the Customer of a nature similar to services provided by the Company to customers generally, or (ii) encouraging the Customer to end, diminish, or move any of his, her, or its accounts or relationships away from the Company, or (iii) encouraging the Customer to refrain from establishing, maintaining, or expanding any account or relationship with the Company. "Customer" refers to any person or entity with whom you had actual contact during the last twenty-four (24) months you were employed by the Company, and also refers to any person or entity having a business relationship with the Company about whom you had knowledge obtained, during the last twenty-four (24) months you were employed by the Company, by virtue of your employment with the Company beyond any such knowledge available to the general public.

(Exs. A and C at 2-3.)

22.     Fountain and Frank further acknowledged and agreed in the Participation Agreements that any "violation of any one or more of the covenants described above would irreparably damage the Bank.  If you breach or threaten to breach any covenant in this Agreement, the Bank may seek specific performance and/or injunctive relief against you, without posting bond,

to prevent such continued or threatened breach, in addition to any other remedies available to it under this Agreement, at law, or in equity." (Ex. A and C at 3.)

23.    Fountain and Frank further acknowledged and agreed in the Participation Agreements (and otherwise acknowledged and agreed in writing on an annual basis), that they would comply with First Horizon's Code of Business Conduct and Ethics and with its "*Matter of Principles*," which define First Horizon's property and contain employee acknowledgements of the need to maintain the confidentiality of First Horizon's Confidential Information and to protect and refrain from taking or using any of First Horizon's property, including, but not limited to, customer files, customer lists, reports, and other data and products developed by First Horizon.

24.    First Horizon's "*Matter of Principles*" incorporates First Horizon's Corporate Records Policy, Procedure and Retention Schedule, which confirms that all records of First Horizon, including email, are subject to First Horizon's records management guidelines. A copy of "*Matter of Principles*" is attached hereto as **Exhibit E.**

25.    First Horizon's Code of Business Conduct and Ethics addresses the obligation of First Horizon employees to protect Confidential Information and provides that employees must maintain the confidentiality of all of First Horizon's Confidential Information, which it defines as any non-public information about First Horizon, its customers, suppliers, employees, shareholders or joint venture partners. A copy of the Code of Business Conduct and Ethics is attached hereto as **Exhibit F**.

26.    In addition to the Participation Agreements, both Fountain and Frank had employment agreements with FHA that similarly contained one-year restrictions on soliciting customers. (Ex. B at ¶ 3, Ex. D. at ¶ 2.) Frank's employment agreement further restricted him from soliciting employees for a one-year period following his employment. (Ex. B at ¶ 3).

**The Raid and Lift Out of the Frank Group from Chattanooga**

27.    Beginning no later than February 2022, Pinnacle began its scheme to raid and lift out key wealth management and private banking employees from First Horizon in Chattanooga, targeting the Frank Group.

28.    Frank worked directly with key Pinnacle officers to target First Horizon employees to terminate their employment with First Horizon and move to Pinnacle, which is a direct competitor of First Horizon.

29.    Pinnacle and Frank were successful in their raid and lift out of the Frank Group, who all resigned abruptly on August 11, 2022, submitting identical resignation notices that they were going to be employed with Pinnacle and registering as financial advisors and brokers with Raymond James Financial Services, Inc.

30.    Immediately thereafter, Plaintiffs began to investigate the sudden lift out of these five FHA employees.

31.    Plaintiffs discovered that on or about March 30, 2022, Pinnacle and Frank coordinated at least one in-person meeting with high-level Chattanooga Pinnacle officers, including its Chattanooga Chairman Craig Holley, its regional President, Kenny Dyer, and its area manager Ryan Murphy, at Holley's personal residence, where Frank invited at least one employee of First Horizon's private banking group, to entertain moving to Pinnacle.

32.    Frank, on behalf of Pinnacle and while still employed at FHA and an officer of the Bank, encouraged this private banking employee to leave First Horizon to join Pinnacle in banking.

33.    Pinnacle encouraged Frank to be a conduit to these employees for the benefit of Pinnacle, while knowing that Frank remained an Officer at the Bank and while an Officer and employee of FHA.

34.    On information and belief, Holley, Dyer, and Murphy were directly involved in the solicitation of other First Horizon employees based in Chattanooga and encouraged Frank to solicit and "lift out" his entire team and other key private banking employees.

35.    First Horizon further discovered that Pinnacle also hired two long-time and key private client banking employees also recruited by Frank while still an officer of the Bank and an employee of FHA. These private banking employees are Christine ("Chris") Evans ("Evans") and Cheryl Garner ("Garner"), who resigned from First Horizon approximately one month before the Frank Group to work for Pinnacle, on July 10, 2022.

36.    Evans was a long-time First Horizon employee.  Her most recent position with the Bank was Vice President ("VP"), Private Client Relationship Manager.

37.    At the time of her resignation, Evans was personally responsible for and otherwise heavily involved with a number of First Horizon's private banking clients, which generated substantial revenue for First Horizon.  In her role as VP, Evans acquired substantial knowledge of the details of private clients' banking relationships with First Horizon and regularly referred private clients in need of wealth management services to the Frank Group.

38.    Pinnacle announced its hiring of Evans and Garner on the same day that the Frank Group abruptly resigned.  A copy of this announcement is attached as **Exhibit G**.

39.    As of no later than August 16, 2022, the "Frank Group," a team comprised of the five former First Horizon financial services employees that had comprised the Frank Group at FHA, were listed on a public website as registered financial advisors with Raymond James affiliated with Pinnacle and led by Frank.  A copy of this web publication is attached hereto as **Exhibit H** (last accessed August 18, 2022).

**The Raid and Lift of the Fountain Group from Memphis**

40.     At the same time it made efforts to brazenly raid and successfully lift out seven wealth management and private banking employees from First Horizon's Chattanooga-area branches, Pinnacle engaged in a parallel recruiting scheme to raid and lift out the eight-member Fountain Group and Wiggs.

41.     On information and belief, this scheme likewise involved a months-long effort whereby Pinnacle used Fountain as a conduit to target and recruit First Horizon employees while he was still an Officer and employee of FHA.

42.     The timing of Pinnacle's efforts was no coincidence.  On August 12, 2022, one day after the immediate resignation of the Frank Group, the Fountain Group resigned abruptly, using almost-identical resignation letters.  The metadata in the Microsoft Word version of several of the resignation notices indicated the notices were drafted by attorneys that represent both Pinnacle and the departing team members.

43.     Pinnacle engaged in efforts to unfairly compete with First Horizon even prior to the resignations of the Fountain Group.  On the same date of their resignations, the "Fountain Financial Group," a team comprised of the eight former First Horizon financial services employees that comprised the Fountain Group, in addition to Wiggs, were listed on a public website as registered financial advisors with Raymond James affiliated with Pinnacle and led by Fountain, including biographical pages and headshots.  A copy of this web publication is attached hereto as **Exhibit I** (last accessed August 18, 2022).

**Pinnacle's Intent to Unfairly Compete with First Horizon**

44.     Pinnacle acted with malice and/or a predatory motive by enticing Frank and Fountain to breach their Participation Agreement with the Bank and violate their duty of loyalty

to First Horizon by conspiring to solicit, and ultimately cause, no less than sixteen of Plaintiffs' employees to defect to Pinnacle in a secretly planned, coordinated lift out for the purposes of harming Plaintiffs and exporting First Horizon's business and clients to a direct competitor.

45.     The sixteen resignations coordinated by Pinnacle, Fountain, and Frank, inclusive of Fountain and Frank's own abrupt resignations, have in fact caused harm to Plaintiffs.  These employees were responsible for substantial and important customer relationships and the defections were, on the part of the Fountain Group and the Frank Group, unexpected and immediate in nature, so First Horizon has had to undertake significant expenses to immediately transition responsibility to its remaining team members and maintain its client relationships.

46.     Frank and Fountain, on behalf of Pinnacle, solicited these employees to work for Pinnacle while still officers and employees of First Horizon, while receiving compensation and benefits from Plaintiffs, in violation of their fiduciary and statutory duties to Plaintiffs, including the duty of loyalty, under Tennessee law.

47.     In their role as employees with FHA, each member of the Fountain and Frank Groups had unfettered and regular access to First Horizon's proprietary and confidential information which constitute trade secrets, for which First Horizon maintains significant safeguards to protect from public disclosure, including, but not limited to, customer lists, customer account information, customer preferences, its financial services offerings, and information regarding the fees charged for its financial services concerning some of First Horizon's most significant individual customers (the "Confidential Information").

48.     In her role as VP for the Bank and through her regular work with the Frank Group, Evans likewise had regular and unfettered access to First Horizon's Confidential Information.

11

49. Pinnacle had knowledge of these employees' access to First Horizon's Confidential Information and trade secrets.

**Pinnacle's Knowledge of Fountain and Frank Groups' Covenants and Obligations to First Horizon**

50. Further, Pinnacle knew, or should have known, of the restrictive covenants to which members of the Fountain and Frank Group are bound, based both on its past solicitation of First Horizon employees and, on information and belief, based on its practice to request and review any such agreements when it solicits First Horizon employees.

51. Specifically, on information and belief, Pinnacle requested that Evans send any agreement that she had that would contain restrictive covenants, which she did.

52. On information and belief, Pinnacle requested a copy of any agreements containing restrictive covenants for all of the employees it lifted from First Horizon, in addition to Evans.

53. The members of the Frank Group and the Fountain Group consulted with, and were advised by counsel for Pinnacle, beginning no later than July 2022.

54. In addition to the aforementioned agreements signed by Frank and Fountain, in consideration for their employment with FHA, Buntin, Ridge, Richardson, Butler, Nicol, VanCleve, Ruston, Wiggs, Brown, Simington, Haley Williams and Paige Williams each had employment agreements that contained reasonable restrictive covenants that prohibit them from directly or indirectly soliciting First Horizon customers.

55. Further, Fountain, Nicol, Ruston, Wiggs, Evans, Frank, and Buntin had agreements with the Bank that were based on other grant, compensation, bonus or incentive programs, which likewise contained reasonable restrictive covenants effective either during their employment and/or post-employment that prohibit them from directly or indirectly soliciting First Horizon customers and employees.

56.     Pinnacle knew, or should have known, that by directing the solicitation of other First Horizon employees and/or directing the solicitation of First Horizon customers, it was inducing Evans and the members of the Fountain and Frank Groups to violate their agreements with First Horizon.

**Pinnacle Utilized its Unlawful Raid and Lift Out to Solicit First Horizon Customers, in Knowing Violation of the Frank and Fountain Groups' Restrictive Covenants**

57.     Since their abrupt exit from First Horizon, the Frank Group has engaged in direct and indirect attempt to solicit First Horizon customers in violation of their restrictive covenants, to the benefit of Pinnacle.

58.     Since their abrupt exit from First Horizon, the Fountain Group has made indirect solicitations of First Horizon customers in violation of their restrictive covenants, to the benefit of Pinnacle.

59.     Pinnacle knew or should have known that Fountain and Frank's direct and indirect solicitations of customers violates the reasonable and necessary provisions of their Participation Agreements with the Bank, including that they would not: (1) "directly or indirectly adversely affect or interfere with any relationship of [First Horizon]with any of its . . . employees [and] customers . . . .," ("non-interference"); (2) "in any manner, directly or indirectly, solicit, hire, or encourage any person who is then an employee of [First Horizon] to leave the employment of [First Horizon]" ("employee non-solicitation"); or (3) "in any manner directly or indirectly solicit or contact any person or entity who is a Customer of [First Horizon] at the time of such solicitation or contact, with the intent or effect of (i) providing one or more services to the Customer of providing one or more services to the Customer of a nature similar to services provided by [First Horizon] to customers generally, or (ii) encouraging the Customer to end, diminish, or move any

of his, her, or its accounts or relationships away from [First Horizon], or (iii) encouraging the Customer to refrain from establishing, maintaining, or expanding any account or relationship with [First Horizon] ("customer non-solicitation")."  (Exs. A and C).

60.    In the weeks leading up to their resignations, members of the Fountain and Frank Groups set up meetings with their top clients.

61.    Beginning immediately after their resignations (and, on information and belief, in the weeks leading up to their resignation), the Fountain and Frank Groups began to directly and indirectly solicit the customers of First Horizon, for the benefit of Pinnacle.

62.    In so soliciting the customers of First Horizon, Frank, Fountain, and their respective teams were acting as agents of Pinnacle and in collusion with top Pinnacle officers.

63.    On August 11, 2022, the same day of the Frank Group's "lift out" from First Horizon, a member of the Frank Group contacted by phone a First Horizon customer and offered to set up a meeting with a top Pinnacle official, in an effort to solicit the customer to move financial services business from First Horizon to Pinnacle.

64.    By the Monday following their resignations (August 15, 2022), First Horizon received notice from at least four customers that they were contacted by Fountain, Frank, Buntin, Ruston, and/or Wiggs to notify them of their departure and, in some instances, to set up appointments to discuss moving their financial services business from First Horizon to Pinnacle.

65.    In the time since, First Horizon has received additional notice and information about direct and indirect customer solicitations by the Frank and Fountain Groups, which are ongoing.

66.    The unlawful solicitation of First Horizon customers has come at great harm to First Horizon.  Since the date of their departures through today, the Frank and Fountain Groups have

solicited and induced top customers with significant accounts previously held by First Horizon to move to Pinnacle.

67.     By unfairly competing with First Horizon and ignoring the contractual obligations of the Fountain and Frank Groups, Pinnacle has caused significant financial harm to First Horizon.

**The Frank Group's Scheme and Misappropriation of First Horizon's Trade Secrets for the Benefit and Use by Pinnacle**

68.     Prior to their exit from First Horizon, the Frank Group compiled certain Confidential Information, including but not limited to, customer lists, customer account information, customer preferences, financial services offerings, and information regarding the fees charged for its financial services concerning some of First Horizon's most significant individual customers, and intentionally took that information when they left FHA to go to work for Pinnacle.

69.     The Frank Group also compiled customer account information in a non-standard electronic format on a document titled "Statement of Account" for some of FHA and First Horizon Bank's most significant customers.

70.     On information and belief, the Frank Group compiled the Statements of Account in an effort to accomplish a scheme to take Confidential Information and trade secrets from First Horizon and access them after they were employed at Pinnacle, all while knowing they remained employed at FHA.

71.     The Frank Group also compiled Confidential Information and trade secrets in physical form to assist in their scheme to misappropriate First Horizon's Confidential Information for the benefit of Pinnacle.

72.     As to the physical form of Confidential Information, First Horizon informed Frank, through his counsel, on August 17, 2022, that certain Confidential Information was missing. On August 25, 2022, a full week later, counsel (who represent both the individual members of the

15

Frank Group and Pinnacle) acknowledged that the Confidential Information was in the possession

of an undisclosed member of the Frank Group (later identified as Buntin) and promised to return

it.

73.     This acknowledgment by Frank's counsel confirmed that this Confidential

Information had been in the possession of a member of Frank's team, while working for Pinnacle

and as an agent of Pinnacle, for at least two weeks since his abrupt resignation from FHA.  The

physical form of the Confidential Information was returned to First Horizon's counsel on August

26, 2022.

74.     In addition to the conduct described in the preceding paragraphs, First Horizon

became aware on August 25, 2022, that a member of Frank's team (later identified as Buntin)

misappropriated other Confidential Information related to First Horizon customers that remained

in his team's possession in physical form after the termination of their employment.

75.     On return of the Confidential Information that was in physical form, First Horizon

investigated and continues to investigate all potential use of the Confidential Information.

76.     First Horizon discovered that the physical Confidential Information retained and

misappropriated by the Frank Group included numerous customers' personal login credentials to

the client portals of First Horizon financial platforms and to one or more financial accounts of the

client's.

77.     Not only did the Frank Group misappropriate customer information by compiling

it in preparation for use for Pinnacle's benefit after their lift out, the Frank Group also later

accessed that customer information for Pinnacle's benefit.

78.     Conveniently for Pinnacle and the lifted-out Frank Group, the Statements of

Account included the above-described Confidential Information and trade secrets compiled by the

Frank Group while employed at First Horizon, that would enable access to account information that would otherwise be unavailable to the Frank Group or Pinnacle.

79.     The misappropriation of this material has caused financial and reputational harm to First Horizon.

80.     On the same day as their resignations, the Frank Group were listed on a public website as registered financial advisors with Raymond James affiliated with Pinnacle, and also changed their FINRA registration accordingly.

81.     As of August 11, 2022, the Frank Group were thus agents of Pinnacle, and their use of First Horizon's Confidential Information was for the use and benefit of Pinnacle.

82.     On information and belief, the Frank Group misappropriated the physical documents by maintaining possession of them and using the physical documents containing First Horizon's Confidential Information to access the additional First Horizon platforms after they became agents of Pinnacle, for the benefit and use of Pinnacle.

83.     The Frank Group used the Confidential Information to enable them to have access to details related to customer accounts in order to provide financial services on behalf of Pinnacle.

84.     The Frank Group services customers that live in no less than two states—Tennessee and Georgia.  The financial services provided by the Frank Group at First Horizon (and now at Pinnacle) affect interstate commerce, including brokerage and investment advice and coordinating electronic securities and banking transactions.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1831 et seq.

85.     Plaintiffs hereby incorporate by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

86.     First Horizon is the owner of valuable trade secrets related to products used in, or intended for use in, interstate commerce, including financial information and business information defined as a trade secret under 18 U.S.C. § 1839(3).

87.     These trade secrets include First Horizon's Confidential Information, including, but not limited to, customer lists, customer account information, customer login information, customer preferences, financial services offerings, and information regarding the fees charged for its financial services.

88.     First Horizon's Confidential Information is not generally known or readily ascertainable by proper means, and First Horizon derives a significant economic and competitive advantage in the institutional brokerage industry and the banking industry by maintaining the security and confidentiality of its Confidential Information, which constitutes or includes trade secrets.

89.     First Horizon invested substantial time, money, and resources to develop its Confidential Information and, accordingly, takes reasonable and appropriate measures to maintain its secrecy.

90.     First Horizon's Confidential Information was communicated to Frank and members of the Frank Group while—and only because—they occupied positions of trust and confidence as employees of FHA, a wholly-owned subsidiary of First Horizon, by which they were provided access to the Confidential Information of First Horizon.

91.     Pinnacle, through its agents and employees, has improperly used and will continue to use First Horizon's Confidential Information for the unauthorized purpose of competing with First Horizon in interstate commerce through Pinnacle and diverting First Horizon business to

Pinnacle, specifically through utilizing customer portals to access information misappropriated by the Frank Group.

92.    The Frank Group's use of First Horizon's Confidential Information occurred while they were acting as agents of Pinnacle, for the benefit of Pinnacle.

93.    Pinnacle's misappropriation of First Horizon's Confidential Information constitutes a violation of the Defend Trade Secret Act, 18 U.S.C. § 1836(b)(1).

94.    Pinnacle's conduct, through its agents and employees, constitutes an intentional, willful, and malicious misappropriation of First Horizon's trade secrets and Confidential Information.

95.    As a direct and proximate result of Pinnacle's ongoing misappropriation of First Horizon's trade secret Confidential Information, First Horizon has suffered and will continue to suffer injury for which First Horizon lacks an adequate remedy at law, including but not limited to, loss of information, loss of secrecy of the information, lost business opportunities, reputational harm, and lost customers.  Accordingly, First Horizon is entitled to a permanent injunction as well as damages, exemplary damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(3).

## COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

96.    Plaintiffs hereby incorporate by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

97.    Pinnacle was at all times aware of the employment relationships between First Horizon's employees and First Horizon.

98.    Pinnacle was aware that Frank, Fountain, and Evans were employees and officers of the Bank and/or FHA, and that they owed First Horizon a fiduciary duty at all times to act in the best interests of their employer.  Due to their positions as officers, Frank, Fountain, and Evans

led teams of employees and occupied positions of trust and confidence, as evidenced by their regular and unfettered access to First Horizon's Confidential Information.

99.     Pinnacle unlawfully aided and abetted Frank, Fountain, and Evans's breach of their fiduciary duties.

100.     Pinnacle knew, or should have known, that Frank, Fountain, and Evans's conduct in effectuating the lift out constituted a breach of their fiduciary duties, which is evidenced by, among other things, Pinnacle's direction and encouragement to raid First Horizon's employees while Frank, Fountain, and Evans were still employed by the Bank and/or FHA.

101.     Key officers of Pinnacle participated in this recruitment, and, on information and belief, did not advise Frank, Fountain, or Evans that it would be inappropriate, unethical, or unlawful for them to recruit First Horizon employees while on First Horizon's payroll.

102.     Pinnacle provided substantial assistance and encouragement to the breaches of fiduciary duty, including participating in meetings, authorizing offers of compensation, and using Frank (and on information and belief, Evans and Fountain) as conduits to negotiate their employment with Pinnacle.

103.     First Horizon has suffered damages as a direct and proximate result of the above-described unlawful aiding and abetting by Pinnacle.

104.     First Horizon is entitled to a judgment for monetary damages against Pinnacle as a result of its unlawful aiding and abetting of Fountain, Frank, and Evans in an amount to be proved at trial.

105.     First Horizon is also entitled to punitive damages against Pinnacle because it acted willfully and intentionally in aiding and abetting Frank, Fountain, and Evans.

20

## COUNT III – UNFAIR COMPETITION

106.    Plaintiffs hereby incorporate by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

107.    Fountain and Frank have engaged in tortious conduct in unlawfully interfering with First Horizon's employment and business relations.  Pinnacle facilitated, encouraged and enabled Fountain and Frank to carry out this tortious conduct, by, among other things, using members of the Frank Group as conduits to offer in-person meetings between top Pinnacle officers and First Horizon's high net worth clients to encourage them to do business with Pinnacle and in-person meetings between top Pinnacle officers and First Horizon employees to solicit and encourage them to leave First Horizon and go to work for Pinnacle.

108.    By facilitating, encouraging and enabling Frank and Fountain to (a) recruit First Horizon employees while Frank and Fountain continued to receive salary and other compensation from both FHA and the Bank, and (b) solicit First Horizon clients in violation of their Participation Agreements, Pinnacle intentionally procured Frank and Fountain's breach of both their contractual obligations to Plaintiffs in their Participation Agreements and their fiduciary duties to FHA and the Bank as employees and officers.

109.    Pinnacle knew that its conduct was unlawful.

110.    Plaintiffs have suffered damages as a direct and proximate result of the above-described unfair competition by Pinnacle.

111.    Plaintiffs are entitled to a judgment for money damages against Pinnacle as a result of its unfair competition in an amount to be proven at trial.

112.    Plaintiffs are entitled to punitive damages against Pinnacle because it acted intentionally and willfully in unfairly competing with First Horizon.

21

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT

113. Plaintiffs hereby incorporate by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

114. The Bank and FHA each have valid and enforceable contractual relationships with Frank and Fountain.

115. Pinnacle had knowledge of these contractual relationships at all relevant times.

116. Pinnacle engaged in improper conduct for the primary purpose of intentionally interfering with Plaintiffs' contractual relations with Fountain and Frank.

117. Pinnacle's tortious actions include, without limitation, knowingly causing and encouraging Fountain and Frank, or others on their behalf, to solicit and/or have contact with First Horizon's employees and customers in violation of their contractual obligations to the Bank and FHA.

118. Accordingly, Pinnacle has improperly interfered with Plaintiffs' contractual relationships with Fountain and Frank.

119. As a direct and proximate result of Pinnacle's intentional and improper interference with the Bank and FHA's contractual relations, Plaintiffs have suffered and will continue to suffer harm, including monetary harm.

## COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

120. Plaintiffs hereby incorporate by reference the allegations set forth in the preceding paragraphs as if fully restated herein.

121. While employed by FHA and the Bank, the Frank Group was given access to valuable existing and prospective customer relationships developed by First Horizon, particularly

its private banking customers, and Confidential Information concerning First Horizon's business relations with those customers.

122.    Pinnacle knew or reasonably should have known about First Horizon's advantageous actual and prospective business relationships with its customers.

123.    Upon information and belief, Pinnacle has intentionally, maliciously, and improperly interfered with and will continue to interfere with, First Horizon's customer relationships by relying on Confidential Information held by the Frank Group and by causing the Frank Group to intentionally and with improper means delay pending First Horizon customer transactions and/or cause the relationships between First Horizon and its customers to end.

124.    As a result of Pinnacle's tortious interference, First Horizon has suffered and will continue to suffer harm due to the intentional and harmful actions of Pinnacle.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, in addition to the relief described above, respectfully pray for the following relief against Pinnacle:

(1) That the Court award Plaintiffs compensatory and other damages, including, but not limited to, an amount equal to the salary, bonus payments, vacation payouts, and all other compensation that First Horizon paid the Frank Group and the Fountain Group from February 2022 (or the date at which they first began acting in the interest of Pinnacle) until the date of the last payment made to any member of those groups after their August 2022 resignations, and any and all other expenses incurred by First Horizon by employing these individuals while they were acting in the interest of Pinnacle;

(2) An award of all damages and remedies allowed by 18 U.S.C. § 1836(b)(3);

(3) That the Court issue permanent injunctive relief barring Defendant from engaging in the use of or disclosing Plaintiffs' trade secrets;

(4) That the Court award Plaintiffs punitive damages, pre-judgment interest, and post-judgment interest;

(5) That the Court award Plaintiffs their attorneys' fees and costs; and

(6) That the Court award any other additional legal or equitable relief as deemed appropriate.

Respectfully submitted,

s/ Jennifer Shorb Hagerman
Jef Feibelman (TN BPR #007677)
Lisa A. Krupicka (TN BPR #10903)
Jennifer Shorb Hagerman (TN BPR #20281)
Sarah E. Stuart (TN BPR #35329)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, Tennessee 38103
Telephone: (901) 524-5000
Email:  jfeibelman@bpjlaw.com
        lkrupicka@bpjlaw.com
        jhagerman@bpjlaw.com
        sstuart@bpjlaw.com